1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCOS REIS-CAMPOS,

              Petitioner,

   v.

MARTIN BITER,

              Respondent.

_____/

No. C 12-03369 SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

     Petitioner Marcos Reis-Campos, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause. Dkt. No. 13. Respondent filed an answer denying the petition. Dkt. No. 16. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

**1.    Procedural Background**

     In July 2007, petitioner, an inmate at Kern Valley State Prison, was convicted by a San Francisco Superior Court jury of second degree murder for the killing of a rival gang member, Luis Guillermo "Memo" Fuentes. His conviction included gang enhancements under California Penal Code sections 186.22(b)(1) and 186.22(d), and firearm enhancements under Penal Code sections 12022.5(a)(1) and 12022.53(d). Petitioner was also convicted of active participation in a criminal street gang in violation of Penal Code section 186.22(a). Petitioner was sentenced to fifty years to life in prison.

On November 9, 2007, petitioner filed a motion for a new trial. On December 14, 2007, the trial prosecutor informed petitioner's defense counsel that there "may be a federal informant who provided information to the Daly City Police Department about a shooting and that . . . [Fuentes] was the purported driver of the vehicle." Dkt. No. 7, First Am. Pet. ("Pet.") at 8. However, the prosecutor stated that the Daly City Police declined to provide further information about the ongoing investigation. *Id.* Petitioner's counsel, concerned that Fuentes's involvement in a retaliatory gang shooting might constitute exculpatory evidence, filed a motion seeking an evidentiary hearing regarding information the prosecution provided to defense counsel. Pet. at 20. The court denied the motion for an evidentiary hearing and the motion for a new trial. Pet. at 21.

On March 12, 2008, petitioner filed a timely direct appeal, in which the California Court of Appeal affirmed his conviction. Pet. at 21; Ex. A. The court affirmed the denial of an evidentiary hearing because the evidence, even if proven, was not material to establish petitioner's assertions that Fuentes's violent nature constituted evidence that petitioner acted in self-defense. *People v. Reis-Campos*, 2010 WL 5115183, at **9-11 (Cal. Ct. App. Dec. 15, 2010). Furthermore, the evidentiary hearing would not be necessary because there was "no indication the person with knowledge of the details of the undisclosed shooting" was one to whom a *Brady* obligation applied. *Id.* at *10. In March, 2011, the state supreme court denied review. Pet. at 21; Ex. B.

Following his appeal, petitioner secured additional information regarding the federal and state investigations and prosecution of the MS-13 gang. Pet. at 21-25. Petitioner then filed writs of habeas corpus in the court of appeal and this Court. *See* Dkt. No. 1. This Court stayed this case pending exhaustion of petitioner's state claims. Dkt. No. 2. On November 29, 2012, the court of appeal summarily denied petitioner's habeas petition. Pet. Ex. C. On February 13, 2013, the state supreme court summarily denied the petition. Pet. Ex. D. Now before the Court is the reopened petition.

In his petition, petitioner alleges that Fuentes's involvement in the unrelated shooting was known by Officer Mario Molina, who testified that he had no knowledge of a retaliatory shooting by Fuentes's gang against petitioner's gang at the criminal trial. Petitioner seeks a writ of habeas corpus on the grounds that the supreme court could not reasonably find that: (1) there was no *Brady v. Maryland*, 373

**United States District Court**
For the Northern District of California

U.S. 83 (1963), violation for denying an evidentiary hearing; (2) the trial court, by preventing petitioner an opportunity to cross-examine Officer Molina about Fuentes's propensity for violence with an excluded FBI document, did not violate petitioner's right to confront witnesses against him; (3) Officer Molina's actual knowledge of Fuentes's involvement in the retaliatory shooting did not constitute a *Brady* violation; and (4) the prosecution did not fail to correct the false testimony of Officer Molina.

## 2.   Factual Background

The following factual background is taken from the direct appeal order of the California Court of Appeal:

> The following evidence was presented at trial: On June 26, 2004, Fuentes was shot and killed near the northeast corner of 24th Street and Hampshire Avenue, an area of the Mission District of San Francisco claimed by the Nortenos, a violent Latino street gang. Thirty-five-year-old Fuentes was the leader of M.S.13, a "very vicious" Latino street gang affiliated with the Surenos, a Norteno enemy. He was found laying face down with gunshot wounds to right cheek, head, and back, and wearing bright blue shoes, the color claimed by the Surenos. Campos, an admitted member of the Nortenos, was identified as the shooter.

> *The Shooting*

> Around 8:00 p.m. that day, Fuentes and his six-year-old son Rafael were walking to the store from a nearby home. Rafael testified that he and his father had just crossed the street holding hands when they saw Campos, and that Fuentes let go of his hand. Rafael heard gunshots and ran home crying. He told his mother a man pulled out a gun and killed his daddy. Rafael testified that Fuentes did not have a gun or knife in his hand when he was shot.

> Denhi D. witnessed the shooting and testified as follows: She was parking her car at the corner of 24th Street and Hampshire Avenue and heard a gunshot behind her to the right. She turned and saw two men standing about a foot away from each other. One had a gun and was standing with his back to a wall, about a foot away from it. The other man was standing with his back to the street. Denhi heard two more shots and saw the man with the gun shoot the other man, who fell to the ground. The shooter did not fire the gun after the victim was on the ground. The shooting happened "extremely fast-a matter of seconds." Denhi did not see the two men struggling for the gun or any physical contact between them. The shooter put the gun in his pocket and ran away, and Denhi followed him in her car. Denhi saw him drop the gun in a planter on the sidewalk and go into a laundromat, where he was later arrested without incident.

> Denhi later identified Campos as the shooter and the man she followed. Another witness who heard gunshots near 24th Street and Hampshire Avenue saw a man running from the scene and later identified him as Campos.

> Police investigators found a .38 caliber revolver stuck inside a potted plant near the scene. The revolver held six rounds of ammunition, and all six shots had been fired. Gunshot residue was found on Campos's right hand.

**United States District Court**
For the Northern District of California

Dr. Amy Hart conducted the autopsy of Fuentes and concluded the cause of death was multiple gunshot wounds: one to his right cheek, two to the back of his head, and three to his back. Dr. Hart could not determine the order in which the wounds were inflicted. She saw no evidence of a close or intermediate range of fire, and she concluded all six wounds were "distant gunshot wounds." Noting that the distance from which the gun was fired could be better measured by test firing the gun, she estimated the shots were fired from a distance of "around a few feet," "[b]ut it could be less than that, or more than that, or a great deal more than that." Dr. Hart said she found no soot or gunpowder particles on Fuentes's hands, as you would expect to see if his hand was very close to the muzzle when the gun was fired.

A firearms expert testified that bullets and bullet fragments recovered from Fuentes's body were from the revolver police found.

*Testimony Regarding Campos's Gang Involvement After the Shooting*

San Francisco Sheriff's Department deputies assigned to the county jail testified that gang-related drawings and "kites" were found in Campos's possession during his incarceration after the shooting. FN2. The deputies opined that Campos was a Norteno shot caller and "tier channel" for his "tank," who had been given a high place in the gang hierarchy.

      FN2. Kites are jail messages that contain "microwriting," "little teeny bits of paper rolled really, really thin. Toothpick size . . . maybe even smaller."

*The Prosecution's Gang Expert*

Officer Mario Molina testified for the People as an expert in Latino gangs, discussing the gang culture in general and the Norteno and Sureno gangs in particular. In Molina's opinion, the shooting was gang-related. He concluded that, in June 2004, Campos was a member of the 22nd and Bryant Street gang, also known as 22B or the Bryant Street Locos (BSL), a subset of the Nortenos. In 2004, 22B was the most criminally active Norteno gang in San Francisco. Campos has gang tattoos all over his body. Field interview cards and photographs from police contacts show he admitted gang membership, was associating with other gang members, and was wearing gang colors in the months before the shooting. FN3. Almost all of the contacts occurred in Norteno territory. A photograph shows him wearing a red bandanna as a headband, indicating membership in the Nortenos, who claim the color red. At the time of the shooting, Campos was not wearing red but had a red bandanna that was ready to be worn as a headband.

      FN3. Campos had never been arrested before June 26, 2004.

Fuentes also had gang tattoos, including the letters "M.S." In 2004, M.S.13 was the most active subset of Surenos in San Francisco. Like the Surenos, M.S.13 is a Norteno enemy and claims the color blue. Officer Molina saw Fuentes at weekly soccer games playing for the M.S.13 team, but had seen and talked to him on M.S.13 "turf." His gang moniker was "Memo." Officer Molina concluded after Fuentes's death that Fuentes was the head of M.S.13 in San Francisco.

At the time of the shooting, Fuentes was wearing blue shoes in Norteno territory, which would be seen by the Nortenos as a sign of disrespect. Officer Molina said gangs have a code of conduct that requires respect for the neighborhood, and Latino gangs claim specific areas and are very territorial. When a rival enters their territory, they feel disrespected and answer the challenge by "checking" the trespasser with a verbal confrontation, followed by an act of violence. Officer Molina opined that the shooting

United States District Court
For the Northern District of California

in this case "is a classical confrontation where a person is perceived as a rival in the defendant's gang turf, and that person was checked and ultimately resulted in a killing." Noting that the gang code also requires "payback" for crimes against the gang, he said Campos called at least three other 22B gang members following his arrest. Campos referred to the gang and said: "Be on the lookout.  I don't want anything to happen to you."  Five months after the shooting, Officer Molina returned to the scene and discovered 22B graffiti on the sidewalk where Fuentes was killed, indicating the gang was claiming the crime.

Officer Molina said: "As a gang member, it's your job to take out your rival." Nonetheless, gang members are not supposed to attack a rival in church or when he is with members of his family.  Younger gang members may break these rules to achieve a higher status.  Officer Molina said, however, that gang members almost always act in groups, and it would be unusual for a gang member to act alone in doing violence to a rival.

Officer Molina said 22B would benefit from Campos's acts in killing Fuentes because the crime would provide recognition, produce fear in the community, and serve as a warning to rival gangs.  Officer Molina said Campos would gain recognition and status in the gang.  Confirming the significance of the kites and drawings found in Campos's possession in jail, he said a gang member can move ahead by "putting in work" for the gang-committing crimes, flashing gang colors, or selling drugs.  Gang leadership is based on the length of membership, loyalty, and readiness to use violence.

Officer Molina identified a prior gang-related assault and robbery, narcotics sale, and drug possession conviction as the predicate crimes establishing 22B as a criminal street gang under section 186.22.

*Campos's Testimony*

Campos said his friends told him in late December 2003 that M.S.13 wanted to kill him because he had disrespected them by dating a girl who was pregnant by an M.S.13 gang member, wearing red in their territory, and turning down Fuentes's invitation to be a member of M.S.13.  Campos was "jumped in" by the Nortenos in February or March 2004 because he wanted protection against M.S.13.  He got his gang tattoos in June 2004.

Campos said the Surenos made threats or attempts on his life at least three times in the months before the shooting.  At 3:00 a.m. on March 29, 2004, he was in Norteno territory with his former girlfriend and another Norteno.  A dark car drove by slowly, looking at them.  A few minutes later, the driver got out of the car and started shooting at him, wounding his former girlfriend.  He recognized the shooter as a member of M.S.13.  After this incident, Campos was afraid.

At 3:00 a.m. on May 22, 2004, Campos was leaving a party in Sureno territory with five friends.  They were all wearing red.  A blue Honda starting chasing them, and Campos recognized the passenger as Fuentes.  Campos and his friends started running.  Someone got out of the car and started shooting at them.

After midnight on June 9, 2004, Campos was with his girlfriend, Eugenia Montoya, and two other friends at a pizzeria in Norteno territory.  Campos went inside while his friends waited outside with his girlfriend and her dog.  An SUV stopped outside, and the passenger started talking to Campos's friends, then pulled out a black gun with a long barrel. Campos ran outside, and the man, who he recognized as Fuentes, pointed the gun at him.  Campos was "scared to death."  FN4.

FN4.  When police arrived, Campos refused to talk to them and left.  He said he "wasn't trying to become a witness.  It could get [his] family killed."  According to Officer Molina, the gang code requires "no snitching to police," and gang members will not talk to police even when they are victims.

Shortly after that incident, Campos saw Fuentes at the Hall of Justice.  Campos was waiting in line when Fuentes walked by him with other M.S.13 gang members.  Fuentes took off his shirt and showed Campos his tattoos.  Fuentes's friend took off his blue belt and showed it to Campos.  Campos was scared.

After that incident, Campos bought a gun to protect himself.

On the evening of June 26, 2004, Campos was walking on 24th Street toward Potrero Avenue to get more tattoos.  He was carrying his gun in his front waistband to protect himself.  He was not wearing red clothing.  He had his red bandanna in his front pocket but was not displaying it.  He did not see any Nortenos he knew in the area.  He crossed Hampshire Avenue and saw Fuentes with his child.  Fuentes let go of the child's hand, and the child walked away and "went inside somewhere."  Fuentes came toward Campos.  "He was looking mad."  Campos backed up to a wall as Fuentes approached.  Two to three feet from Campos, Fuentes "bent over," and Campos thought he was reaching for a gun, so Campos pulled out his own gun.  FN5.  Fuentes reached for the gun and grabbed it.  Campos pulled back and, in a panic, started shooting because he was scared for his life: "He could take the gun away from me and kill me.  He was bigger and stronger than me."  FN6.  He said he was not thinking about improving his position in 22B; he just wanted to defend himself: "Could be me or him.  He had tried to kill me in the past."  Campos said if he had run away, he risked being shot.  He has "gained [status and prestige].  But that wasn't what [he] wanted."  Although he killed a rival gang member, he did not do it for the gang.

FN5.  Rafael testified that Fuentes "bent over" right before the shooting.
FN6.  Fuentes was 5'5" tall and weighed 211 pounds.  Campos was a little taller but 50 to 60 pounds lighter.

*Testimony Regarding the March 29, May 22, and June 9, 2004 Incidents*

Officer Raul Elias testified that on March 29, 2004, at 3:30 a.m., he encountered Campos and a friend assisting a female who had a bullet wound.  He found bullet casings in the area of the shooting and bullet holes in a vehicle parked there.  The victims described the shooter as a Black male, six feet tall and 170 pounds.  He was not wearing gang colors.  The victims did not say they recognized the shooter or that he was a gang member.

At 3:40 a.m. on May 22, 2004, officers responded to a call of "shots fired."  At the scene, they found bullet casings from a semiautomatic weapon, as well as bullet holes in a wall of a building and vehicles parked nearby.  A witness, who testified at trial, told the officers two Latino males in a blue two-door Honda Civic were shooting at six Latino males in red clothing, who were running away.  The witness described the shooter as: bald, 18 to 20 years old, 5' 5" tall, weighing 160 pounds, and wearing a blue shirt.  Officer Robert Greiner learned of the shooting during briefing that day, and at 5:30 p.m. that afternoon, stopped a blue Honda with Fuentes and two other Latino males inside.  The driver was a Sureno.  No weapons were found in the vehicle.

On June 9, 2004, Officer Marco Garcia responded to the pizzeria where someone had brandished a gun.  A male and female were wearing red shirts, but a third male, who refused to provide his name, was not wearing red.  Officer Garcia noted a shooting in

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Sureno territory an hour and a half later that he believed was retaliation for the pizzeria incident, and indicated the man with the gun was a 16th Street Sureno, not M.S.13.

Eugenia Montoya, who was at the pizzeria, testified at trial that a truck drove up, and the passenger, a Latino male in a blue sweater, asked if she and her friend were Nortenos. When her friend said he was, the man pointed a gun at her and said it would be better to shoot her and her dog.

*The Prosecution's Rebuttal Witness*

Jarred Newman (Newman), Campos's cellmate in July 2004, testified against him. Newman said that, when a candlelight ceremony for Fuentes was shown on television, Campos commented, "Pinches Scrapa," indicating that Fuentes was a "scrap," a derogatory term for a Sureno. Shortly thereafter, Newman heard Campos talking again about the incident. Campos said he had killed Fuentes and "gave a visual of how it went down": He first saw Fuentes across the street a half a block to a block away and was throwing gang signs to him and showing his tattoos. Campos crossed the street and approached Fuentes, who was holding hands with his child, and they exchanged words. Fuentes said, "You are loco. Leave me alone[.] I am with my kid" and pulled a knife. Campos backed off and followed Fuentes for a couple of blocks, and Fuentes realized he was being followed. Campos ran back toward Fuentes, opened his sweatshirt, and showed his gun, then shot Fuentes in the face and chest. Campos was happy about the incident and said Fuentes's son would grow up to be a scrap, hate Nortenos, and "come after them" one day. He did not say he knew Fuentes before the shooting.

*Attorney Argument*

The prosecutor contended Campos killed Fuentes "in classic execution style" to benefit the gang and gain status. She argued that Fuentes was a rival who disrespected Norteno territory and was an easy target because his son was with him. The prosecutor acknowledged Fuentes's membership in M.S.13, but downplayed it, maintaining Campos was the aggressor, his claim of self-defense was "all fabricated," and it was "ridiculous" to tie Fuentes to the March 29, May 22, and June 9, 2004 incidents.

The defense argued that Fuentes came toward Campos and backed him up against a wall, noting that Fuentes was "a strong muscular man . . . [a] powerful man" and Campos was an "18-year-old kid who is thin and who is very afraid." Campos emphasized that the shooting occurred quickly, leaving no time for cool reflection.

*Reis-Campos*, 2010 WL 5115183, at **2-7.

Petitioner argues that the trial court denied him the opportunity to cross-examine Officer Molina regarding his testimony about Fuentes's involvement in a retribution shooting in response to a Norteño gang killing of an MS-13 member with the moniker "Trucho." Pet. at 8.; Rep.'s Tr. ("RT") at 1095-96. Officer Molina testified that he was unaware of any retaliation against Norteños in response to Trucho's death. Pet. at 18.; RT at 1032. Petitioner claims that the federal informant referenced in the prosecutor's post-trial letter to defense counsel was a high ranking MS-13 member, Jaime Martinez, recruited by Officer Molina. Pet. at 9-10. In an October, 2005 interview with Officer Molina and a

Daly City Police officer, Martinez claimed that shortly before Fuentes's death, Fuentes was a passenger in a car involved in a murder of a Norteño in Daly City in retaliation for Trucho's death. Pet. at 10. Furthermore, petitioner claims that Officer Molina had more information about Fuentes's violent nature than he disclosed at petitioner's trial. Pet. at 9. Molina testified at a 2011 RICO trial against seven MS-13 members, detailing MS-13's violent history. *Id.* The basis of his testimony was an investigation spanning from 2004-2008 known as "Operation Devil Horns." *Id.*

Petitioner also claims that before trial, his counsel obtained a heavily redacted FBI report describing how Fuentes had once posed undercover as a homeless person to participate in a gang shooting. Pet. at 41; Pet. Ex. H. The document also stated that Fuentes taught other Sureños the technique. *Id.* With this information, petitioner filed a motion in limine to cross-examine Officer Molina regarding his knowledge of Fuentes's reputation for violence in the community. Pet. at 41. The trial court denied the motion. *Id.* Petitioner avers that the prosecution argued that Fuentes was not known for being violent at trial. Pet. at 42.

**STANDARD OF REVIEW**

A district court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

1  decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*

2  *(Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

3      "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

4  state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

5  applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal habeas court may not

6  issue the writ simply because that court concludes in its independent judgment that the relevant state-

7  court decision applied clearly established federal law erroneously or incorrectly. Rather, that application

8  must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application"

9  inquiry should ask whether the state court's application of clearly established federal law was

10  "objectively unreasonable." *Id.* at 409.  "A state court's determination that a claim lacks merit precludes

11  federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of that decision."

12  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citation omitted).

13      "When a federal claim has been presented to a state court and the state court has denied relief,

14  it may be presumed that the state court adjudicated the claim on the merits." *Richter*, 131 S. Ct. at

15  784-85.  Generally, the court will look through summary denials of habeas corpus and review the last

16  reasoned decision on the federal claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) ("Where there

17  has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

18  judgment or rejecting the same claim rest upon the same ground.").  But for state court decisions without

19  any written decisions on the merits to reference, "a habeas court must determine what arguments or

20  theories . . . could have supported, the state court's decision." *Richter*, 131 S. Ct. at 786.  In cases in

21  which the evidence before the reviewing court differs from the evidence before the court that made the

22  last reasoned decision, the court "review[s] the reasonableness of the [court of summary denial] by the

23  evidence that was before it, and [uses] the [last reasoned decision court's] reasoning in accordance with

24  our usual practice of 'looking through' summary denials to the last reasoned decision." *Cannedy v.*

25  *Adams*, 706 F.3d 1148, 1159 n.5 (9th Cir. 2013) *amended on denial of reh'g*, 733 F.3d 794 (9th Cir.

26  2013) *and cert. denied*, 134 S. Ct. 1001 (2014).

27

28

United States District Court
For the Northern District of California

**DISCUSSION**

1. ***Brady* Violation**.

Since the state court habeas petitions were summarily denied, the only "reasoned decision" the Court has to review in accordance with *Ylst v. Nunnemaker* is the direct appeal order.

Petitioner argues that the California state court could not reasonably find that *Brady* did not require an evidentiary hearing due to the prosecution's post-trial receipt of potential evidence regarding Fuentes's participation in an unrelated shooting. Pet. at 34. Respondent counters that the evidence, even if impermissibly suppressed, is not material. Dkt. No. 16-1, Mem. P. & A. in Supp. of Ans. ("Ans.") 15. Petitioner argues that the evidence is material because it helps corroborate petitioner's testimony that he feared Fuentes because of Fuentes's violent nature. Pet. at 38-39. Petitioner also contends that, after petitioner provided the court further information about the federal gang investigation, the state courts could not reasonably have found that there was no *Brady* violation. Pet. 45-46.

The California Court of Appeal held:

No such hearing was required here in any case. The trial court concluded an evidentiary hearing would not establish a *Brady* violation regardless of what it showed because the undisclosed evidence was not material. This is a question of law that we review independently. (See *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) "[A] showing of materiality does not require demonstration . . . that disclosure . . . would have resulted ultimately in the defendant's acquittal . . . ." (*Kyles*, *supra*, 514 U.S. at p. 434.) "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [Citation.]" (*Ibid.*) Undisclosed evidence is material under *Brady* if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles*, at pp. 434-435, fn. omitted; *In re Miranda*, *supra*, 43 Cal.4th at p. 575.)

Applying these principles, we agree with the trial court's conclusion that the undisclosed evidence was not material. First, as the trial court recognized, there was considerable evidence at trial showing Fuentes's violent nature. Specifically, the jury heard evidence that Fuentes was a known member of M.S.13, a "very vicious street gang" that was responsible for shootings, stabbings, and other homicides in San Francisco and the most active subset of Surenos in the city in early 2004. The evidence showed Fuentes's deep entrenchment in the gang: He had gang tattoos, hung out in gang territory, and was wearing gang colors at the time of his death. His associates were M.S.13 and Surenos, and the prosecutor repeatedly referred to him at trial using his gang moniker, "Memo." Indeed, the People's gang expert, Officer Molina, concluded that Fuentes was the leader of M.S.13, the "shot caller" who controlled the gang, noting that a gang member's rise to such a position is based in part on "his readiness to use violence." Officer Molina's

United States District Court
For the Northern District of California

testimony indicates that the shot caller often initiates and organizes gang killings, as gang members are expected to "take out" rival gang members and retaliate violently for past wrongs. Officer Molina acknowledged a Sureno slogan: "Kill a Norteno, win a prize[;] kill a Sureno and your whole fucking family dies."

Contrary to Campos's assertion, the jury heard evidence that Fuentes committed specific acts of violence. Campos identified Fuentes as a passenger in the car involved in the May 22, 2004 drive-by shooting and as the one who threatened him with a gun on June 9, 2004. Testimony from police officers and percipient witnesses confirmed that these incidents occurred.

Second, the undisclosed evidence would have done little to undermine the prosecution's attempt to paint Fuentes as a "benign" gang member, as Campos contends, since it identifies Fuentes only as the driver of the vehicle, not the shooter. Nor would it have lent significant force to Campos's impeachment of Officer Molina, who did not testify that Fuentes was nonviolent or deny that Fuentes was involved in gang activity. Assuming Campos could obtain admissible evidence of the undisclosed shooting, it might corroborate his testimony that Fuentes participated in the incidents against him and rebut the prosecutor's contention it is "ridiculous" to conclude Fuentes was involved. As noted above, however, the jury heard similar evidence suggesting Fuentes's involvement in the May 22, 2004 shooting itself. A police officer testified that on the same day as the May 22, 2004 shooting, he stopped a car matching the description of the vehicle involved in that incident and encountered Fuentes and another Sureno inside.

Although the question is a close one, we do not believe the undisclosed evidence "reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict." (See *In re Miranda*, *supra*, 43 Cal.4th at p. 575.)

Campos argues that "the exact nature of the evidence and . . . its possible effect on the trial" cannot be determined without an evidentiary hearing. This argument overlooks one essential point: in determining materiality, the evidence at issue is what is known to the prosecutor or "the others acting on the government's behalf in the case" (*Kyles*, *supra*, 514 U.S. at p. 437), "'information gathered in connection with the government's investigation'" (*In re Brown*, *supra*, 17 Cal.4th at p. 879), evidence known to the "prosecution team" (*In re Steele* (2004) 32 Cal.4th 682, 697). Here, the trial court based its decision on the bare facts in the prosecutor's possession, which her letter indicates were all she was able to obtain. There is no indication the person with knowledge of the details of the undisclosed shooting, Sergeant Jaime Draper of the Daly City Police Department, participated in the investigation of Fuentes's death or the prosecution of Campos. "'[T]he prosecution cannot reasonably be held responsible for evidence in the possession of all government agencies, including those not involved in the investigation or prosecution of the case.' [Citation.]" (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1476, citing *In re Steele*, at p. 697.)

Campos contends Sergeant Draper was "in close consultation with Officer Molina," so "it is clear that the information regarding Fuentes's participation in a gang-related murder was available to Officer Molina whether he in fact knew of it himself. And that is all that is required to bring the evidence within the *Brady* obligation." He provides no legal authority, however, establishing that mere availability of evidence is sufficient to invoke a prosecutor's *Brady* obligation. Indeed, the authority on which he relies confirms that *Brady* requires disclosure only of evidence known to the prosecution team, not all information available to its members. (*In re Steele*, *supra*, 32 Cal.4th at p. 697 [whether the evidence is known to members of the "prosecution team," including both investigative and prosecutorial agencies and personnel]; *People v. Superior Court*

*(Barrett)* (2000) 80 Cal.App.4th 1305, 1314-1315 [same].) Assuming, without deciding, that Officer Molina was a member of the prosecution team, the record does not show he knew more about the undisclosed shooting than the prosecutor.  In setting out his expert qualifications, he said he works with and shares information with other law enforcement agencies outside of San Francisco, including Sergeant Draper.  Sergeant Draper is assigned to the San Mateo Gang Task Force, which has "sort of a network" with San Francisco.  Officer Molina said he attended monthly meetings "to see what goes on in San Mateo . . . [and] just to stay current with each other . . . ."  Any claim that he was in possession of additional evidence regarding the shooting, however, is speculation at best, as the record does not indicate he discussed this case with Sergeant Draper.  FN8.  The trial court properly concluded, therefore, that the evidence within the prosecutor's knowledge was not material and an evidentiary hearing to determine when and how it came to her attention was unnecessary.

> FN8.  The broad application Campos seeks to give *Brady* would also hold the prosecution responsible for evidence within the knowledge of all other contact persons Molina identified in Contra Costa County, Richmond, Hayward, San Jose, and Salinas.

To the extent Campos's request for an evidentiary hearing on the *Brady* issue was brought "in connection with [a] pending motion for a new trial," we note that section 1181, the statute that sets out the grounds for a new trial in California, does not require the trial court to hold an evidentiary hearing.  When a motion for a new trial is based on jury misconduct, trial courts have discretion to conduct evidentiary hearings in deciding a motion for a new trial when necessary to determine a material fact in dispute.  *(People v. Avila* (2006) 38 Cal.4th 491, 604 [jury misconduct].)  Even in such cases, however, "'[t]he hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.'"  (*Avila*, *supra*, at p. 604.)  FN9.  The evidence Campos submitted does not show such a possibility here.

> FN9.  Federal and state habeas proceedings do not provide for an evidentiary hearing based on the bare possibility that a *Brady* violation has occurred.  (See Cal. Rules of Court, rule 4.551(f) ["An evidentiary hearing is required if, after considering the verified petition, the return, any denial, any affidavits or declarations under penalty of perjury, and matters of which judicial notice may be taken, the court finds there is a reasonable likelihood that the petitioner may be entitled to relief and the petitioner's entitlement to relief depends on the resolution of an issue of fact"]; *Duvall*, *supra*, 9 Cal.4th at ¶. 475-478 [in state habeas proceeding, the court evaluates whether petition pleads sufficient facts that, if true, would entitle petitioner to relief and if so, issues order to show cause, prompting a return alleging facts justifying the detention, a traverse admitting or denying these factual allegations and framing the material factual issues in dispute that require an evidentiary hearing]; *Campbell v. Wood* (9th Cir.1994) 18 F.3d 662, 679 ["An evidentiary hearing is not required on allegations that are 'conclusory and wholly devoid of specifics.'"]; see also *Strickler v. Greene* (1999) 527 U.S. 263, 286-287 ["Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review . . . .  The presumption . . . that prosecutors have fully '"dis- charged their official duties,'" [citation], is inconsistent with . . . a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred"].)

*Reis-Campos*, 2010 WL 5115183, at **9-11.

United States District Court
For the Northern District of California

The appellate court's order provides ample reasoning in support of its determination that the denial of an evidentiary hearing was not a *Brady* violation in this case. To the extent that petitioner challenges the supreme court's habeas denial on grounds that there should have been an evidentiary hearing, *Cannedy* directs the Court to review the supreme court's denial in light of the new evidence but to look to the direct appeal order for the reasoning. *See* 706 F.3d at 1159.

Because the state courts summarily denied the habeas petition, the Court must now consider if there are any arguments or theories based upon which the state court could have reasonably denied petitioner's *Brady* claim. *Richter*, 131 S. Ct. at 786 (stating that, for state court decisions without any written decisions on the merits to reference, "a habeas court must determine what arguments or theories . . . could have supported, the state court's decision").

The government has an obligation to surrender favorable evidence that is "material either to guilt or to punishment," even if the defendant does not request disclosure of such evidence. *Brady*, 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 107 (1976). To establish a *Brady* violation, the defendant must show that (1) evidence favorable to the defense; (2) was suppressed by the state, either willfully or inadvertently; and (3) the suppression resulted in prejudice. *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006). The police have a *Brady* obligation to turn over evidence not known to the prosecution when acting on the government's behalf. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Phillips v. Ornoski*, 673 F.3d 1168, 1186-87 (9th Cir. 2012) (citing *Jackson v. Brown*, 513 F.3d 1057, 1072 (9th Cir. 2008)). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citation omitted). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and citation omitted).

### A.      Reasonableness of the Direct Appeal Order Review.

The California Supreme Court could have reasonably found that denial of an evidentiary hearing was proper under *Brady* because the claimed evidence would not be material. Even with the newly revealed contents of the suppressed evidence, the supreme court could still reasonably conclude that there was not "a reasonable probability that the suppressed evidence would have produced a different

United States District Court
For the Northern District of California

verdict." *See Strickler v. Greene*, 527 U.S. 263, 281 (1999). While the new evidence provided with the habeas petition adds inferences that the person with knowledge of potentially exculpatory evidence was Officer Molina,[1] its greater detail does not strengthen petitioner's materiality argument. The evidence helps support, as reasonable, petitioner's general beliefs about Fuentes's violent nature. However, although it gives context to their previous interaction as testified to by petitioner at trial, it does not develop the real question that was before the jury; that is, whether at the time of Fuentes's death, petitioner actually feared for his life.

Petitioner's main contention is that he testified about how his prior interactions with Fuentes caused his fear of Fuentes, but that, without further evidence of Fuentes's violent behavior, the jury may have disregarded his testimony. Pet. at 38-39. However, the direct appeal order notes that "there was considerable evidence at trial showing Fuentes's violent nature." *See Reis-Campos*, 2010 WL 5115183, at *9. On review of the record, the jury knew about Fuentes's involvement with MS-13 and that the gang was violent, in particular with regard to its feud with the Norteños. *See, e.g.*, TR at 1022 (Fuentes was a "shot caller"); 1075-76 (MS-13 is responsible for homicides and is retaliation oriented). Thus the supreme court could reasonably have found that additional evidence was unnecessary to convince the jury that Fuentes was violent in general.

Petitioner's evidence is repetitive and does not enhance or add credibility to what the jury already knew about Fuentes's propensity for violence against Norteños in general. Nor does it corroborate petitioner's testimony about Fuentes's personal threats and attacks on petitioner. Indeed, the court of appeal noted that evidence corroborating petitioner's testimony about Fuentes's personal threats was admitted at trial. *See Reis-Campos*, 2010 WL 5115183, at *10 ("A police officer testified

---

[1] Because it did not have access to all the facts later presented in the habeas petition, the appellate court's order did not contain an unreasonable application of *Kyles*. Unknown to the appellate court on direct appeal, the petitioner names Officer Molina as the person with knowledge of potentially exculpatory evidence. Officer Molina testified at petitioner's trial on behalf of the prosecution. *Brady* obligations extend to police officers who are involved in the prosecution of a crime. *See Kyles*, 514 U.S. at 437. Therefore, the California Supreme Court, on the evidence presented, could not have reasonably concluded that *Kyles* did not create a *Brady* obligation by concluding "[t]here is no indication the person with knowledge of the details of the undisclosed shooting, . . . participated in the investigation of Fuentes's death or the prosecution of Campos." *See Reis-Campos*, 2010 WL 5115183, at *10. However, this error would still have been insufficient grounds on which the supreme court could grant the petition if it found that the evidence was not material. *See, e.g.*, *Towery v. Schriro*, 641 F.3d 300, 310 (9th Cir. 2010) (rejecting a *Brady* claim if only the first two prongs are met.).

that on the same day as the May 22, 2004 shooting [at petitioner], he stopped a car matching the description of the vehicle involved in that incident and encountered Fuentes and another Sureno inside."). Because Fuentes's actions in an unrelated incident were not inconsistent with what would have to be attributed to him as a gang member by the jury, the supreme court could reasonably have found, under *Brady*, that the evidence would not have a material effect on the jury's perception of Fuentes's treatment of petitioner.

Petitioner also claims that he could have impeached Officer Molina's testimony and discredited the prosecution's argument that Fuentes was nonviolent. Pet. at 39. The Court disagrees. First, the court of appeal reasonably concluded that Officer Molina did not testify that Fuentes was nonviolent; instead, Molina was brought in to testify as to his opinion regarding whether the killing was gang-related. *See* Clerk's Tr. at 097, People's Mot. In Limine (prosecution desired to call Officer Molina, as a gang expert, to testify about gang affiliation, membership, and existence of gang). Furthermore, the reviewing court could reasonably conclude that Officer Molina's testimony, as argued by the prosecution in attempting to establish that Fuentes was not a violent gang member, could have been interpreted by the jury as only applying to Fuentes at the specific moment he was walking down the street with his child on the day of his death. *See* TR at 1476 (prosecutor rhetorically asking the jury "What's a 30-year old guy with a kid gonna do to a rival gang member who's armed with a gun?  Not much, because his hands are tied because of that child's presence.").

Petitioner's reliance on *Cone v. Bell*, 556 U.S. 449, 471 (2009), in support of his argument is misplaced. In *Cone*, the petitioner argued that suppressed evidence of his drug use directly contradicted the prosecution's assertion that he was not a drug addict. *Id.* Here, however, the supreme court could have reasonably found that the prosecutor's argument that Fuentes was not engaging in typical gang behavior at the time he was shot, did not contradict the fact that Fuentes was a violent gang member at other relevant times. Petitioner's evidence would only rebut an argument that Fuentes always acted as a regular family man, but there was already evidence in the record suggesting that Fuentes was a gang member with violent tendencies. Officer Molina's testimony that the gang code of conduct forbids violence around families and that violence is typically administered in groups could not be rejected by

the jury due to any knowledge that the jury had about Fuentes' otherwise violent propensities.[2]  Thus, the supreme court could have reasonably concluded that the overall effect of the information before the jury did not paint a picture of Fuentes as benign and nonviolent.

Accordingly, the Court finds that the other courts reasonably denied petitioner's claims.

**B.      Reasonableness of the California Supreme Court's Decision on the New Evidence.**

When a California court summarily denies a habeas petition on the merits without establishing the truth of the claims, it holds that "'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 n.12 (2011) (citing *In re Clark*, 5 Cal. 4th 750, 770 (1993)). Thus "the [state] court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also 'review the record of the trial . . . to assess the merits of the petitioner's claims.'" *Id.* (citing *People v. Duvall*, 9 Cal. 4th 464, 474 (1995); *Clark*, 5 Cal. 4th at 770).

For the reasons mentioned above, the Court has found that the appellate court's reasoning is sufficient to find that the new evidence, even assuming its truth, was not material.  Therefore, the supreme court had reasonable grounds to deny the petitioner's claims under the *Richter* standard.  As stated above, although the new evidence helps establish the veracity of petitioner's claims, and identifies Officer Molina as having knowledge of the evidence, the new information was not material.

The Court must presume that the supreme court's denial amounted to a holding that petitioner failed to establish a prima facie claim to relief.  *Pinholster*, 131 S. Ct. at 1402.  Thus, petitioner is not entitled to an evidentiary hearing on this matter.

**2.      Confrontation of Officer Molina.**

Petitioner next asserts that his Sixth Amendment right to confrontation was violated when he was prevented from cross-examining the prosecution's gang expert about Fuentes's violent past using an FBI

---

[2] Informant Martinez identified Fuentes as a vehicle passenger who gave directions to the shooter in the incident claimed to be in retribution for Trucho. *See* Pet. Ex. J. This is consistent with Molina's testimony that Fuentes was a "shot caller" in a violent gang, rather than actual evidence that Fuentes was violent.

United States District Court
For the Northern District of California

document. Pet. at 44-45. The document contains information that Fuentes taught other Sureños how to commit undercover shootings. Pet. Ex H. Petitioner notes that Officer Molina testified that he was unaware of Fuentes's reputation for violence. Pet. at 41. Petitioner argues that this testimony, without an opportunity for cross-examination, was prejudicial because the prosecution used that testimony in arguing that Fuentes was not a violent gang member, but instead was a "family man" and a painter. Pet. at 42. Respondent first notes that although petitioner's initial motion dealing with this issue was denied, petitioner had an opportunity to revisit the issue once there was proper foundation for its introduction. Ans. at 27. Additionally, respondent asserts the evidence could only have been received for a limited purpose, and not for its truth, and therefore would not have had a substantial impact on the jury's verdict. Ans. at 29-30.

The Court of Appeal also addressed this issue on direct appeal:

> Campos provides no citations to the record showing the trial court made a final decision denying his motion or identifying the evidence excluded. The only evidence we find in the record culminates in a *preliminary* ruling by the trial court not to allow the evidence during the defense's cross-examination of Officer Molina unless there was evidence in the record at that time supporting a claim of self-defense. The trial court said it would rule on the issue at the beginning of Officer Molina's cross-examination, but that, in any case, "the expert would be subject to recall should the victim's reputation become relevant." The trial court noted that its ruling was probably just "postponing what might well be inevitable" and invited defense counsel to seek a sidebar to revisit this issue at "the right time."

> We find no indication in the record that the trial court addressed this issue during Officer Molina's cross-examination or that defense counsel raised it again. We also note evidence at trial regarding Fuentes's gang tattoos, membership in a violent gang, and role as a "shot caller" for M.S.13. Thus, the record does not show the trial court denied the defense the opportunity to question Officer Molina regarding Fuentes's reputation for violence. FN11.

>> FN11. The Attorney General concedes the court excluded the reference to the FBI report during the cross-examination of Officer Molina, but does not provide a record citation. We note, however, that in the opposition to the motion for a new trial, the People emphasized that the trial court's ruling on his motion in limine to cross-examine the People's gang expert regarding Fuentes's reputation for violence was preliminary and that the trial court noted this ruling could change based upon the evidence, but the issue "was not revisited." The trial court also noted in denying the motion for new trial: "I think I told counsel [the pre-trial in limine rulings] were subject to change if the evidence or the admissibility of certain matters became apparent."

> Even if the defense was precluded from questioning Officer Molina regarding the FBI report, any error in this regard was harmless. First, Campos could not have questioned Officer Molina regarding the contents of the FBI report. Although the shooting incident set forth in that report would have been compelling evidence of Fuentes's character for violence if the defense had sought to establish it with admissible evidence, the FBI report

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

and its contents were hearsay and were not independently admissible. (Evid.Code, § 1200.) An expert may base his opinion on evidence "whether or not admissible" . . . if it is the kind of information experts reasonably rely upon in forming an opinion on the subject matter involved. (Evid.Code, § 801, subd. (b).) Although an expert may identify the matters on which he relied, he may not testify regarding the details of matters that are otherwise inadmissible. (*People v. Coleman* (1985) 38 Cal.3d 69, 92 ["he may not under the guise of reasons bring before the jury incompetent hearsay evidence"].) "A party attacking the credibility of the expert may bring to the jury's attention material that is relevant to the issue of which the expert was unaware [citation], . . . but that party may not by its questions testify regarding the content of that material." (*People v. Visciotti* (1992) 2 Cal.4th 1, 81.) Moreover, to the extent an expert mentions inadmissible evidence in identifying the basis for his opinion, the jury may not consider such evidence for its truth. (See *Coleman, supra,* 38 Cal.3d at p. 92.) Thus, in this case, the jury could have considered the FBI report only for the limited purpose of undermining the basis for Officer Molina's opinions, not in establishing that Fuentes was a "killer and a trainer of killers" as Campos sought to prove. FN12.

> FN12. Officer Molina never specifically opined that Fuentes was nonviolent or that he did not have a reputation for violence. Thus, we question the FBI report's impeachment value in any case.

*Reis-Campos*, 2010 WL 5115183, at **11-12.

The "Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

A court violates the "Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic." *Fenenbock v. Dir. of Corr.*, 692 F.3d 910, 919 (9th Cir. 2012). Indeed, a limitation on cross-examination that excludes testimony on a particular topic might violate the rule that "[r]estrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness's] credibility . . . had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680;

18

United States District Court
For the Northern District of California

*Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009). The focus of this inquiry "must be on the particular witness, not on the outcome of the entire trial," *Van Arsdall*, 475 U.S. at 680, such that defense counsel's ability to impeach other witnesses "is irrelevant" to whether the trial court violated the Confrontation Clause, *Slovik*, 556 F.3d at 754. A limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness. *United States v. Urena*, 659 F. 3d 903, 907-08 (9th Cir. 2011).

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotations and citations omitted). Accordingly, the Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes." *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013). Instead, a defendant need only be provided "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Under the AEDPA, a state court's ruling should be disturbed due to "new evidence presented for the first time in federal court[,] only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

The Court must review the state supreme court's habeas denial on the Confrontation Clause issue looking at the reasoning of the direct appellate order, but in light of the evidence before the supreme court on habeas. Because there is no clearly established United States Supreme Court precedent on the right to introduce extrinsic evidence to confront witnesses, the Court reviews the denial of the extrinsic evidence based on the broader right to present a meaningful defense.

Here, the state supreme court could have reasonably concluded that denying petitioner the ability to introduce evidence of Fuentes's violent past did not violate petitioner's confrontation right. A state trial court has substantial discretion in making evidentiary findings. *See Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 897 (9th Cir. 1996) ("[A] petitioner for federal habeas relief may not challenge the application of state evidentiary rules . . . ."). As explained by the Court of Appeal, the trial court's decision did not prevent petitioner from admitting the evidence when its relevance was clearer.

The Court finds that the supreme court could have reasonably determined that the trial court did not err in preventing petitioner from introducing extrinsic evidence about Fuentes's violent past. At the pretrial hearing, it was unclear what relevance the FBI report would have to petitioner's self-defense claim. Nonetheless, the issue was left open by the trial court. *See* TR 272-73 (trial judge explaining exclusion: "If there is evidence of [imperfect self-defense,] I'm sure it will come out, and I suspect that my ruling in this regard is merely postponing what might well be inevitable, and these in limine motions are really preliminary."). Once the introduction of a self-defense argument at trial undermined the justification of the trial court's pretrial holding, the defense was permitted to renew its motion, but apparently chose not to do so. The supreme court could have reasonably concluded that the defense strategy was to argue for self-defense on separate evidence and that it was therefore not the trial court's preliminary ruling that precluded the introduction of the FBI report. Even if the exclusion of the report during the initial motion in limine was final, the state supreme court could have found that the petitioner nevertheless had sufficient evidence to mount a meaningful critique of Officer Molina's testimony because of the ample evidence of Fuentes's gang affiliations that was introduced at trial.

Additionally, even if the FBI report had been admitted, its use would have been limited to challenging the credibility of Officer Molina's opinion. *See Korsak v. Atlas Hotels, Inc.*, 2 Cal. App. 4th 1516, 1524-25 (1992) ("Although experts may properly rely on hearsay in forming their opinions, they may not relate the out-of-court statements of another as independent proof of the fact."). The assertions in the FBI report do not indicate that Officer Molina would know of Fuentes's violent tendencies, thus limiting the impact that any cross-examination could have had on the jury's credibility determination. Nor does the report significantly undermine Officer Molina's competence as an expert. The report could not have been introduced for its truth, and as the court of appeal found, the jury already had ample evidence indicating that Fuentes was more violent than Officer Molina's knowledge indicated. Although the Court believes the better practice would have been to permit the defense to confront Officer Molina with this evidence, the supreme court could have reasonably concluded that introduction of this evidence would not have changed the jury's opinion as to Molina's credibility.

Petitioner disagrees with this assessment and contends that California evidence law would have required admitting this report as evidence of the victim's prior behavior as it related to petitioner's self-

1  defense claim.  Pet. at 42-43.  However, even assuming the evidence would have been admissible on

2  the issue of self-defense, the Court's review of a state court's evidentiary decision on new evidence is

3  limited to the extent the excluded evidence would have been "highly probative and central to petitioner's

4  claim" of self-defense.  *See Taylor*, 366 F.3d at 1001.  Here, the court of appeal found that the record

5  contained ample evidence of Fuentes's propensity for violence toward others, thus the new evidence was

6  duplicative and not highly probative.

7      Petitioner further argues that the FBI report also imposed an obligation on the prosecution not

8  to argue that Fuentes was non-violent.  In *Miller v. Pate*, 386 U.S. 1, 6 (1967), the Court found a

9  violation of Fourteenth Amendment Due Process when the prosecution knew that clothing in evidence

10  was stained with paint, not the victim's blood, but argued it was blood anyway.  By contrast, here the

11  supreme court could have found that the prosecution did not make unwarranted arguments because the

12  prosecution's arguments about Fuentes were not aimed at establishing that he had a non-violent nature

13  generally, but rather that Fuentes would not have acted violently when accompanied by his young child,

14  as he was during the incident in question.

15      Accordingly, the Court finds that the exclusion of the FBI report did not deny petitioner his right

16  to cross-examine Officer Molina.

17

18  **3.      Uncorrected Perjured Testimony**

19      Petitioner argues that Officer Molina's testimony was false and that the prosecution failed to

20  correct the false testimony.  Pet. at 53.  Respondent disagrees that the testimony was in fact false.  Ans.

21  at 33.

22      "A judgment of conviction based on testimony known by representatives of the state to be

23  perjured deprives the defendant of due process of law."  *Mooney v. Holohan*, 294 U.S. 103, 112-13

24  (1935).  When a conviction is obtained by the use of testimony that the prosecutor knew or should have

25  known was perjured, the conviction is set aside if there is a reasonable likelihood that the judgment of

26  the jury was affected by the testimony.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976).  This is

27  the result even if the prosecutor, though not soliciting false evidence, does not correct such evidence

28  when it is presented.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  A prosecutor has a duty under the

**United States District Court**
For the Northern District of California

1    Constitution to correct false evidence if the prosecution knows its witness has lied.  *United States v.*

2    *LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

3         "To prevail on a claim based on *Napue*, the petitioner must show that (1) the testimony (or

4    evidence) was actually false, (2) the prosecution knew or should have known that the testimony was

5    actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886,

6    889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71).  "Material" means that there is a reasonable

7    likelihood that the false evidence or testimony could have affected the judgment of the jury.  *Morris*,

8    447 F.3d at 743.  Knowledge of the falsity is imputed to all the attorneys on the prosecuting team.

9    *Giglio v. United States*, 405 U.S. 150, 154 (1972).

10        The Court reviews this claim using the *Richter* standard because there is no reasoned decision

11   on the merits of the *Napue* claim.  *See* 131 S. Ct. at 786 (stating that, for state court decisions without

12   any written decisions on the merits, the reviewing court "must determine what arguments or theories

13   . . . could have supported, the state court's decision").  If there was any reasonable basis for the supreme

14   court to deny the claim, the Court may not disturb that decision.

15        The supreme court could have reasonably concluded that Officer Molina's testimony was not

16   false.  At trial, the prosecution asked Office Molina, "[D]o you have an opinion whether M.S. extracted

17   any retaliation for Trucho's [a Sureño] murder from the time Trucho was murdered until the point in

18   time that Memo [Fuentes] was murdered?" TR 1032.  Molina responded, "I cannot think of any incident

19   right now, but that doesn't mean it didn't happen.  I just cannot think of any." *Id.*  Petitioner's claims,

20   taken as true, establish that, prior to his testimony in this case, Officer Molina was present when a

21   confidential informant stated that a drive-by shooting death of a Norteño was retaliation for Trucho's

22   death. *See* Pet. Ex. J.  However, Officer Molina's recall of this meeting could have failed for a variety

23   of reasons, and his inability to recall this statement on the stand does not necessarily mean that he

24   presented the jury with perjured testimony.  Thus, the supreme court could have found his testimony not

25   to be false – even if at other times he remembered it – and held that there was no false testimony to

26   correct.  If the supreme court so found, then petitioner's further argument that Officer Molina's knowing

27   introduction of false testimony should be attributed to the prosecution also fails.  Accordingly, the Court

28   finds that the supreme court had a reasonable basis for denying petitioner's *Napue* claim.

**4.      Certificate of Appealability**

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural [rulings]" in the order of dismissal or in this order. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The denial of the certificate of appealability is without prejudice to petitioner seeking a certificate from the Ninth Circuit.

## CONCLUSION

For the foregoing reasons and for good cause shown, and on the basis of the record before it, the Court hereby DENIES the petition for a writ of habeas corpus.

**IT IS SO ORDERED.**

Dated: September 26, 2014

_____
SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

23